UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA ST. ONGE,

          Plaintiff,                       CASE NO. 04-71329

-vs-                                 PAUL D. BORMAN
                                 UNITED STATES DISTRICT JUDGE

LIVINGSTON COUNTY,

          Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND:**

      Sandra St. Onge ("Plaintiff") is a breast cancer survivor.  Plaintiff was diagnosed in

April, 2001, and missed two months of work with Livingston County ("Defendant") on Family

Medical Leave Act ("FMLA") leave.  Upon return from her FMLA leave, Plaintiff contends that

Defendant discriminated against her in violation of the FMLA and the American with

Disabilities Act ("ADA").

      Plaintiff sets forth six counts against Livingston County Defendant:

      Count I - Violation of the FMLA;

      Count II - Retaliation of in violation of the FMLA;

      Count III - ADA/Regarded as Disabled;

      Count IV - ADA/Record of Disability;

      Count [V] - ADA/Failure to Provide Reasonable Accommodation;

Count [VI][1] - ADA/Determinable Disability.[2]

(Plaintiff's Complaint).

Plaintiff was hired as a judicial clerk assigned to the legal division of the Livingston County Clerk's office. (Plaintiff's Dep. at 26). Margaret Dunleavy is the Livingston County Clerk. Direct oversight of the judicial clerks is conducted by the legal division supervisor Laura Chafy. (Dunleavy's Dep. at 5). Plaintiff has testified that Laura Chafy and Margaret Dunleavy have not liked her from "day one." (Plaintiff's Dep. at 90-91, 114). A judicial clerk is assigned one of three positions at the Clerk's office:

1. Front Counter Clerk, where the clerk is responsible for assisting the public with filings, payments etc.

2. Vault Clerk, where the clerk is responsible to file pleadings and act as a runner in between the judge's offices.

3. Courtroom Clerk, where the clerk is responsible for docketing or scheduling and entering data into the Court computers.

(Chafy's Dep. at 179). The pay and title was the same regardless of whether a clerk was assigned as a vault, front counter or courtroom clerk. On the other hand, Plaintiff has testified that the front counter clerk position is considered the entry level position - the position where "everyone" who begins their employment with the Court starts. (Plaintiff's Dep. at 225). Plaintiff also trained new employees for the front counter clerk position. (*Id.*).

Defendant contends that Plaintiff's employment history with the County was less than exemplary. Defendant points to one particular incident in January, 1997. Attorney, Edwin

_____

[1]Plaintiff's Complaint mistakenly labels her ADA/Failure to Provide Reasonable Accommodation and ADA/Determinable Disability claims as Count IV.

Literski obtained an ex parte Order which prohibited Plaintiff from giving legal advice.  Mr. Literski later wrote a letter stating that he obtained the order to protect his client, and had no intent that Plaintiff be punished.  (Plaintiff's Response, Ex. O).

Before Plaintiff's FMLA leave, her job performance could be fairly characterized as mixed.  Plaintiff's April 21, 1999, job performance evaluation provided that her "good features" were that she was "Friendly, Knowledgeable, and Reliable."  Her "areas to work on" included "Accuracy in computer input, Inadvertently Undermining authority, and Personal business." (Defendant's Motion Ex. D).

Before Plaintiff took her FMLA leave in July, 2001, she worked as a courtroom clerk and also spent part of her week clerking for Livingston County Circuit Judge Stanley J. Latreille. While Plaintiff's performance as a courtroom clerk may have been mixed, it appears that her performance for Judge Latreille was well regarded.  Judge Latreille wrote a letter of recommendation for Plaintiff as follows:

> As a Circuit Court judge for the last two decades I have worked with many people over the years.  Sandy St. Onge has always impressed me as a young woman who is hard working, eager to learn and willing to work with other people to achieve the team's goals.  I am happy to recommend her for employment.  She will bring experience and maturity to any task that she is asked to perform.

(Plaintiff's Response, Ex. N).  Chafy has also testified that there were no concerns regarding Plaintiff's performance with Judge Latreiile.  (Chafy Dep. at 51-52).

Plaintiff was diagnosed with breast cancer in April, 2001, and missed two months of work for surgery and recovery.  Plaintiff was granted FMLA leave on July 18, 2001 commencing July 23, 2001, for approximately six weeks.  (Plaintiff's Response, Ex. J).  Her surgery was July 24, 2001; Plaintiff had both breasts removed in response to advanced cancer.  (*Id.* Ex. A, ¶9).

After surgery, Plaintiff alleges she had no abdominal muscles, had to roll out of bed each morning, could not get out of a bathtub, and had difficultly climbing stairs and walking long distances.  (*Id.* ¶49).

The Circuit Court's Clerk's office had been reorganized when Plaintiff returned. Plaintiff was reassigned to the front counter clerk's position.[3]  Plaintiff's pay and title remained the same.  Plaintiff, however, testified that it was a less prestigious position involving less responsibility and more stress.  (*Id.* at 127, 225).  Plaintiff also testified that she was offended when Laura Chafy welcomed her back from her "vacation" the day she returned from her FMLA leave.  (Plaintiff's Dep. at 119-120).

Plaintiff testified to her co-workers reaction to her reassignment as follows:

A. ... we all got along very well.  We weren't just co-workers.  We were friends ... And then after I came back from family leave and everything was taken from me and I was put up at the front counter, everything changed demeanor-wise amongst everybody.  It was almost like they had felt like they deceived me.

Q.  How?

A.  Because they were taking my responsibilities, my job responsibilities.  They didn't think it was fair that was all being done to me because I had cancer.

Q.  Who said that?

A.  Everybody, Linda, Brenda, Lisa, Jackie, Michelle, Margo, Theresa....

(Plaintiff's Dep. at 130-131).

On September 19, 2001, before Plaintiff returned from her FMLA leave, she had a meeting with Margaret Dunleavy and Laura Chafy.  The notes from this meeting prepared by

---

[3]Plaintiff continued to spend part of her week clerking for Judge Latreille.  (Plaintiff's Aff. ¶3, Plaintiff's Response, Ex. M).

Chafy provide in pertinent part:

> Margaret and I also shared with Sandy our intention of re-arranging job responsibilities within the office, as well as the re-assignment of work stations, and, indicated that we would like to effectuate these changes beginning on Oct. 1st. Our proposed changes will change Sandy's job responsibilities. We are changing her job responsibilities from civil docketing to front desk customer service. We would like her to be one of our two front desk clerks, specializing in assisting our customers who are 'pro per', or, customers who are representing themselves in a court proceeding. Sandy has excellent people skills, and is accomplished in her knowledge of the court system. We believe that she can be an asset to the front desk and of good assistance to the customers. Additionally, in making these changes we discussed with Sandy that these changes were influenced by our present and prior concerns relating to Sandy's accuracy in the docketing of pleadings and the maintenance of the Case Register of Actions. These concerns have been reviewed with Sandy a number of times in the past on an informal basis and most recently in February of this year.
>
> We would like Sandy to continue court clerking for Judge Latreille as we believe that she does a commendable job there.
>
> Sandy's initial reaction to these issues is that she is being "demoted." She was reassured that we perceive these job responsibility changes as positive changes that would allow her to use her best attributes, as we see them, and are being made to help the office as a whole to function to the best of our abilities in providing quality service to the Courts and the public.
>
> We invited Sandy to think about today's meeting and welcomed any additional thoughts or concerns that she may have subsequent to today's meeting. We would like to effectuate these changes, see how things go, and re-visit them in a few months.

(Defendant's Motion, Ex. D).

Defendant sets forth several incidents of Plaintiff's poor work performance after her return from FMLA leave. Defendant provides a letter written by Matthew Michaels complaining that Plaintiff was rude to him and stated that his son (who was not present) needed an "attitude adjustment." (Defendant's Ex. D). Defendant also sets forth complaints from Juvenile Court Probation Officer Susan Grohman stemming from a personal dispute between she and Plaintiff. (*Id.*). Chafy, however, testified that Plaintiff's dispute with Grohman had nothing to do with

Plaintiff's termination.  (Chafy's Dep. at 47).

On September 13, 2002, Defendant gave Plaintiff a disciplinary interview which

provided:

The following actions need to be taken in order for you to be employed with us.

1.  Reduce amount of time spent on personal phone calls and using your e-mail for purposes other than job responsibilities.

2.  Take more responsibilities for the front counter by staying at your work station and being receptive to serving customers and not using a loud voice.

3.  Be thorough in processing the mail by correctly time stamping all pleadings/placing the receipt # on motions and enter hearing dates and distribute copies.

and MOST OF ALL have a change in attitude that shows respect for your employer and your co-workers.  You are inconsistent and people don't know if you are going to be helpful or make statements that it is not your job.

Telling your co-workers and other departments that you are put upon, not treated fairly, demoted and that you don't get made (sic) you will get even.  Statements such as if I go down everybody else goes down with me.

Boils down to an atmosphere that is lacking in trust and respect for those you work for and with.

(*Id.*).

Plaintiff testified that Chafy began to intensify her scrutiny of her after she returned from

her FMLA leave.  (Plaintiff's Dep. at 249).  Plaintiff further testified "[w]hen I had cancer

[Chafy's] whole demeanor changed towards me.  That's when she started singling me out and

treating me different." (Plaintiff's Dep. at 115).  The Court notes that after Plaintiff's return

from FMLA leave, Defendant began document Plaintiff's alleged work transgressions with much

greater frequency than before her leave.  (Defendant's Ex. D).

Plaintiff points to Jacqualine Chivinski's testimony, which provided that other County

6

employees (Linda Peckins and Brenda Evans) were talked to about excessive phone calls. (Chivinski's Dep. at 197-198, 224).  Chivinski also testified that she felt Brenda Evans was just as social as Plaintiff, and that Lisa Bailey-Rousch received a lot of calls from her children and was sometimes "short" with customers.  (*Id.* at 50).  Nothing was documented regarding these incidents with Peckins, Evans and Bailey-Rousch.  Chafy testified that Plaintiff, Evans and Peckins were all counseled about personal phone calls, but only Plaintiff received a memo about it.  (Chafy's Dep. at 17-18).

On June 13, 2003, there was a cash shortage in the clerk's office which is in dispute by the parties.  The cash in the Clerk's office cash drawer was $300 short when compared to the cash receipts.  There were several violations of the County's unwritten procedures regarding cash handling that day.  Brenda Evans committed the first violation when she made change for personal reasons, exchanging fifteen $20 bills for three $100 bills.  (Defendant's Motion, Ex. D).  Plaintiff also violated the office's unwritten policy when she made two large cash deposits of $2,2770.00 and $3,320.00 without someone else to count it with her.  (*Id.* Ex. E).

The day before the cash drawer incident, June 12, 2003, Plaintiff noticed a "golf-ball" size lump on her left breast.  Plaintiff went to work and asked Brenda Evans, who was acting as supervisor in Chafy's place, to come into the vault where they could speak privately.  Evans felt the lump and told Plaintiff to get to the doctor.  (Plaintiff's Dep. at 204-205).  Linda Peckins, Peggy Toms, and Gayle Cameron were among those who felt the lump.  (*Id.*).  Evans called Dunleavy, in front of Plaintiff, to tell her about the development.  (*Id.* at 205, 208).[4]

---

[4]Thereafter, the lump was aspirated and treated with antibiotics.  (Plaintiff's Dep. at 208-209).

7

Plaintiff was fired on June 19, 2003. Laura Chafy was on vacation from June 9th to June 16th, 2003. (Chafy's Dep. at 80). Chafy and Dunleavy testified that they came to the conclusion to fire Plaintiff on June 17, 2003. (Chafy's Dep. at 150-151). Chafy, despite repeated objections by her counsel, testified that the cash mishandling incident precipitated the timing of Plaintiff's termination. (*Id.* at 101-102). Dunleavy also suggested that the money shortage was the determining factor. (Dunleavy's Dep. at 33). However, Laura Chivinsky testified that Chafy and Dunleavy held a staff meeting on June 20, 2003, in which Dunleavy stated that the missing $300.00 had nothing to do with Plaintiff's termination. (Chivinsky Dep. at 32).

Plaintiff filed her complaint on April 8, 2004. Defendant filed its motion for summary judgment on April 18, 2005. Plaintiff responded on May 23, 2005. Defendant filed two replies both of which were stricken from the record. The first reply was stricken by Plaintiff's request. The second reply was stricken per Defendant's request based upon Plaintiff's violation of this Court's local rules. Oral argument was held on July 18, 2005.

## **ARGUMENTS:**

1.    Defendant's Argument

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation under the FMLA or ADA because no adverse employment action was taken upon her return to work. (Defendant's Motion, at 16). Defendant argues that Plaintiff's termination was not causally related to her FMLA leave or record of disability. (*Id.* at 18-19). Defendant also argues that Plaintiff cannot establish that she was not terminated for legitimate non-discriminatory reasons. (*Id.* at 19-20).

2.    Plaintiff's Argument

8

Plaintiff contends that her FMLA claims are viable because Defendant failed to return her to an equivalent position upon her return from FMLA leave, retaliated against her after that leave, and fired her in anticipation of another leave.  (Plaintiff's Response, at 14-16).  Plaintiff also contends that her ADA claims are viable because she was disabled under the ADA and Defendant discriminated against her and failed to reasonably accommodate her.  (*Id.* at 19-20).

## ANALYSIS

**A.  Standard for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## B.   Discussion

### 1.   Plaintiff's FMLA Interference Claim

Initially, in order for Plaintiff to bring forth a FMLA claim, she must prove three elements: (1) she must be an eligible employee; (2) Defendant must be an eligible employer; and (3) Plaintiff must prove that she was entitled to FMLA leave. *Cavin v. Honda of Am. Mfg., Inc.*,

10

346 F.3d 713, 719 (6th Cir. 2003).  The Court finds that it is undisputed that all three elements are present instantly.   Plaintiff is an eligible employee because she was a full time employee since 1995.  (29 U.S.C. §2611 (2)(B)(ii) requires that an eligible employee work over 1250 hours within the preceding 12 month period).  Defendant has admitted it is an eligible employer.  (Defendant's Answer ¶29).  Lastly, Defendant has never disputed that Plaintiff was entitled to her FMLA leave.

Upon returning from leave under the FMLA, an employee is entitled to be restored to their former position or to an equivalent position with equivalent benefits, pay, and other terms of employment.  29 U.S.C. § 2614.  The FMLA provides:

> Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave -
>
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

26 U.S.C. § 2614.

To establish an interference claim, the employee must show that (1) she is an "eligible employee", (2) the defendant is a covered "employer", (3) the employee was entitled to FMLA leave, (4) the employee notified the employer of the need for leave, and (5) the employer denied the employee FMLA benefits.  *Cavin v. Honda of America Manufacturing Inc.,* at 716 (6th Cir. 2003).   The Court finds that the first four elements are not in dispute.  For Plaintiff to prevail on the fifth element, she must show that Defendant failed to restore her to an "equivalent position" under 29 U.S.C. §2614 (a)(1)(B).

Regarding an equivalent position, 29 C.F.R. §825.215 provides:

11

> (a) An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

(29 C.F.R. §825.215). The Court notes that the regulation includes status as relevant to this analysis. Because it is undisputed that Plaintiff's new position was equivalent in terms of pay and benefits, the issue become whether it was equivalent in status. The Court finds *Donahoo v. Master Data Center,* 282 F.Supp. 2d 540 (E.D. Mich. 2003) instructive. In *Donahoo,* the issue was whether the plaintiff's two positions were equivalent in terms of pay, benefits, perquisites and status. The defendant argued that the plaintiff's new position carried equal pay and benefits to her former position and therefore the two were equivalent. The Court held that the positions were not equivalent. Providing that while the pay and benefits are the same:

> the regulation also requires equivalent status, and the two positions were not equivalent in terms of status: a data-entry job is not as sophisticated, nor does it require a similar level of training and education, as a computer analyst. Therefore, the jobs were not equivalent....

(*Id.* at 552).

It is clear that Plaintiff considered the position as a demotion. Important to the *Donahoo* Court's analysis, and important here, is whether the two positions require a similar level of training and education. It was reasonably clear in *Donahoo* that more training and education was required for the plaintiff's computer analyst position opposed to her new data entry position.

Plaintiff testified that her new position was an "entry level" position from which employees started when they began in the office, and from which she had trained new employees. (Plaintiff's Dep. at 225). She also testified that she had job responsibilities taken away from her including civil docketing, civil notices, processing of court orders and substitute

12

clerking for Judge Reck.  (*Id.* at 127).

Jacqualine Chivinsky testified to the front counter position as opposed to the docket entry position as follows:

> Q. ...Do you think, do you think in your opinion is one - is working at the counter less prestigious than docket entry?
>
> A.  To me it's less prestigious.
>
> Q.  Okay.  Why is that?
>
> A.  I have my own desk.  I'm given responsibilities that are important.  That's how I feel about it.

(Chivinsky Dep. at 15-16).  The Court notes that Chivinsky was given Plaintiff's job after her termination.  Based upon the evidence, the Court finds that there is a question of fact as to whether Plaintiff's new front counter clerk position is an equivalent position in terms of status.  Therefore, the Court finds that Plaintiff has set forth sufficient evidence to survive summary judgment on her FMLA Interference claim.

### 2.      Plaintiff's FMLA Retaliation Claim

Plaintiff argues that she has established a prima facie case of retaliation under the FMLA because she was terminated for exercising her rights under the FMLA.  Plaintiff contends that the retaliation began immediately after her return from leave, and involved her demotion, unwarranted discipline and ultimately her termination.  Plaintiff also contends that she was fired in anticipation of another FMLA leave in 2003.  Plaintiff notes that she faced a recurrence of cancer and leave - including a golf ball sized lump, two doctor visits and a scheduled surgery before Defendant decided to fire her.

The Court finds that Plaintiff has presented sufficient evidence to demonstrate a prima

facie case of FMLA retaliation.  To establish a prima facie case of retaliation under the FMLA, Plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; (3) the employment action or harassment was causally related to the protected activity.  *Skrianc v. Great Lakes Power Serv. Corp.,* 272 F.3d 309, 314 (6th Cir. 2001).

Under Michigan and Federal law, where there is no direct evidence to establish a question of fact on discriminatory intent, Courts turn to the *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) burden shifting framework.  Under *McDonnell Douglas* a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas* 411 U.S. at 802; *Dubey v. Stroh Brewery Co.,* 185 Mich. App. 561 (1990). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action.  *St Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993).  Plaintiff must then prove that the reason put forth by the defendant was a mere pretext for discrimination.  *McDonnell Douglas,* 411 U.S. at 802.

The Court finds that Plaintiff has established a prima facie case of FMLA Retaliation. Plaintiff has demonstrated a temporal connection concerning her demotion and termination.  The Sixth Circuit has held that proximity in time can raise of prima facie case of retaliation. *Chandler v. Specialty Tires of Am. (Tenn.),* 283 F.3d 818, 826 (6th Cir. 2002) (citing *Skranc* at 314).  Further, the short time frame between Plaintiff taking her FMLA leave and the alleged retaliation supports Plaintiff's claim.  The Sixth Circuit has provided that for a retaliation claim "[a]lthough no one factor is dispositive in establishing a causal connection, evidence ... the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant

14

causation." *Singfield v. Akron Metropolitan Housing,* 389 F.3d 555, 563 (6th Cir. 2004) (quoting *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

The Court finds that the evidence shows that Plaintiff was placed into a less desirable position immediately upon her return of her FMLA leave.  Further, the proximity in time between Plaintiff's anticipated leave and her termination in 2003 supports a finding of a prima facie case.  Plaintiff informed Chafy about the lump on her breast and that she had to leave work to go see a doctor.  Plaintiff was fired the next day on June 19, 2003.  The Court finds that Defendant has not set forth evidence showing a legitimate reason for the timing of Plaintiff's firing.

The Court finds that the evidence viewed in a light most favorable to Plaintiff, provides that Defendant may have reasonably believed that she had a recurrence of cancer, and would require another FMLA leave.  There is evidence that Defendant knew that Plaintiff had a lump on her breast which had to be surgically removed.  As Plaintiff set forth in her EEOC Rebuttal:

> Upon Laura's [Chafy] return from vacation on June 17 she was getting coffee and I was on my way to court and I informed her of the lump in my breast.  She gave me a hug and assured me everything would be ok.  I also informed her about my doctors appointment the next day on the 18th.  She said NO problem do what you've got to do.
>
> Had 2nd doctor appointment on June 18, 2003 and the doctor said I was going to require surgery. On June 19, 2003 I went into Laura's office about 8:30am and told her I needed to have surgery.
>
> She said no problem and I told it was scheduled for July 7 and she marked me off on the calender.
>
> At 5:00pm Margaret asked me to stay late and I was terminated without reason.

(Plaintiff's Response, Ex. L).  The Court notes that Chafy testified consistently with Plaintiff's EEOC Rebuttal regarding the sequence of events.  (Chafy's Dep. 153-155).  Chafy however,

15

testified that she and Dunleavy had already decided to terminate Plaintiff before they knew of Plaintiff's scheduled surgery. (*Id.*). On the other hand, the Court finds that regardless of when Defendant "decided" to terminate Plaintiff, she was not terminated until after Defendant received the information about her lump and scheduled surgery.

Regarding the cash handling incident, Chafy, despite repeated objections by her counsel, testified that the cash mishandling incident precipitated the timing of Plaintiff's termination. (*Id.* at 101-102). Dunleavy also suggested that the money shortage was the determining factor. (Dunleavy's Dep. at 33). However, Chafy and Dunleavy held a staff meeting on June 20, 2003, in which Dunleavy stated that the missing $300.00 had nothing to do with Plaintiff's termination. (Chivinsky Dep. at 32). Jaqualine Chivinsky testified as follows:

Q. Did anyone ask why [Plaintiff was fired]?

A. I did.

Q. What did you ask?

A. I asked if it had anything to do with the three hundred dollars that was missing?

Q. And did someone answer that question?

A. Margaret [Dunleavy] did.

Q. What did she say?

A. She said no, it had nothing to do with it.

(Chivinski Dep. at 31-32).

Because of this conflicting evidence, the Court finds summary judgment inappropriate. Defendant contends that Plaintiff's continued unsatisfactory work performance was a legitimate non-discriminatory reason for her termination. To raise a genuine issue of material fact on the

16

validity of an employer's explanation for an adverse employment action, the plaintiff must show by a preponderance of the evidence, either that (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. *Texas v. Burdine,* 450 U.S. 248, 252-53 (1981).

The Court finds that Plaintiff has shown by a preponderance of the evidence that Defendant's reason for her termination was pretextual. Regarding the first element above, Defendant brings forth evidence demonstrating Plaintiff's poor job performance, which Plaintiff contends was no worse than her co-workers. Even accepting that Plaintiff had work performance issues, the Court finds that Plaintiff has established by a preponderance of the evidence, that Defendant's proffered reasons did not actually motivate her termination. The Court makes this determination based upon the timing of Plaintiff's termination. As noted above, Defendant cannot point to a reason as to why June 19, 2003 was the day Plaintiff was terminated. As previously mentioned, Chafy and Dunleavy held a staff meeting on June 20, 2003, in which Dunleavy stated that the missing $300.00 had nothing to do with Plaintiff's termination. (Plaintiff's Response, Ex. E, at 32). There are two conflicting inferences to be drawn from Plaintiff's termination, the first is Defendant's contention - that Plaintiff was fired because of her job performance. The second inference, Plaintiff's contention - that Plaintiff was fired in retaliation of the FMLA leave taken due to her cancer and in anticipation of her imminent FMLA leave due to the lump on her breast. The Court finds that Plaintiff has shown by a preponderance of the evidence, the second inference, because she was fired a day after she told Defendant about her reoccurring medical condition, and Defendant has not articulated why it fired Plaintiff at the time she was terminated other than the cash handling incident from which

17

there is conflicting evidence.  As one court has provided:

> A plaintiff can discredit an employer's explanation by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable factfinder could find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Cinelli v. U.S. Energy Partners et al.,* 77 F.Supp. 2d 566, 578 (N.J. D.C. 1999) (internal citation

omitted).

Further, there is evidence that Defendant increased its scrutiny towards Plaintiff after her

return from FMLA leave, and the tone of Defendant's correspondence to her changed drastically.

For example, Chafy wrote Plaintiff the following email on February 20, 2001:

> It was nice meeting with you last Thursday.  Your efforts in staying within the office and staying more focused on your work is notable and much appreciated.  I think you and I were both pleased with your progress and see this progress as a <u>continuing</u> effort.

(Defendant's Ex. D).  The tone of Defendant's correspondence changed after Plaintiff's return,

Plaintiff's September, 2002 interview makes no mention of praise and provided:

> and MOST OF ALL have a change in attitude that shows respect for your employer and your co-workers.  You are inconsistent and people don't know if you are going to be helpful or make statements that it is not your job.
>
> Telling your co-workers and other departments that you are put upon, not treated fairly, demoted and that you don't get made (sic) you will get even.  Statements such as if I go down everybody else goes down with me.
>
> Boils down to an atmosphere that is lacking in trust and respect for those you work for and with.

(*Id.*).  Whether the change in tone by Defendant was warranted is an issue of fact.  The Court

notes, however, that this change did occur after Plaintiff exercised her FMLA leave and this

supports her claim.

In making this determination, the Court is mindful that "Courts have recognized that in

18

discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain....thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." *Singfield, infra,* at 564. Therefore, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's FMLA Retaliation claim.

**3.      Plaintiff's ADA Claims**

Plaintiff sets forth four claims under the ADA - three for discrimination - actual disability, record of disability, and regarded as disabled, and one for failure to accommodate.

In order for Plaintiff to sustain her disability counts, she must show the following elements: (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position with or without reasonable accommodations; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) her position remained open after her termination. *Hammon v. DHL,* 165 F.3d 441, 449 (6th Cir. 1999).

Plaintiff contends that she was disabled under the three categories set forth in 42 U.S.C. §12102(2), hence, she pleads three counts of disability discrimination. Section 12102(2) provides three categories of disability: (1) an actual physical impairment which substantially limits one or more major life activities, (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. §12102(2). Plaintiff's ADA claims are analyzed below.

**a.      Actual Disability Claim (an actual physical impairment which substantially limits one or more major life activities)**

As noted above, the first element Plaintiff must prove is that she was disabled within the meaning of the ADA. Under Plaintiff's Actual Disability Claim, she must demonstrate "an

19

actual physical impairment which substantially limits one or more major life activities." The

Court finds that Plaintiff's physical impairment was cancer, which qualifies as an impairment.

45 CFR part 84, App. A., p. 334 (1997); *Bragdon v. Abbot,* 524 U.S. 624, 633 (1998).  The

question now becomes whether it substantially limits one or more major life activities.  Plaintiff

contends that it limited her major life activities of (1) working, causing her to miss two months

of work in 2001, and (2) mobility and strength.  The Court finds that  Plaintiff suffered from an

actual disability under the ADA when she was on her FMLA leave in 2001.  However, the Court

finds that Plaintiff has not demonstrated that she was actually disabled at the time she was

terminated.  The record establishes that Plaintiff continued to work upon her return from FMLA

with no restrictions.  The Fifth Circuit has held that although cancer is an impairment under the

ADA, an employee who had been successfully treated for breast cancer did not have an actual

disability under the ADA where she was not substantially limited in her ability to work.  *Ellison*

*v. Software Spectrum,* 85 F.3d 187 (5th Cir. 1999).  Similarly here, the Court finds that Plaintiff

has not demonstrated that she was substantially limited in her work or any other major life

activities at the time of her termination.  Therefore, the Court grants Defendant's Motion for

Summary Judgment on Count V - ADA/Determinable Disability because Plaintiff cannot

demonstrate she was disabled at the time of her termination.

**b.     Regarded as Disabled ADA Claim**

Plaintiff contends that she was "regarded as" disabled because Defendant reasonably

believed that she had a recurrence of cancer, and that it limited her in the past.   At the outset, the

Court notes that Plaintiff has not provided any legal authority for the proposition that Plaintiff

meets this definition.  The Court grants summary judgment on Plaintiff's "regarded as" disabled

20

claim because Plaintiff has failed to satisfy the definition of "being regarded as having a

disability."  The Court finds that this category of disability is not applicable to the instant facts.

The United States Supreme Court has provided regarding the "regarded as" definition of

disability:

> There are two apparent ways in which individuals may fall within this statutory
> definition: (1) a covered entity mistakenly believes that a person has a physical
> impairment that substantially limits one or more major life activities, or (2) a covered
> entity mistakenly believes that an actual, nonlimiting impairment substantially limits one
> or more major life activities.  In both cases, it is necessary that a covered entity entertain
> misperceptions about the individual - it must believe either that one has a substantially
> limiting impairment that one does not have or that one has a substantially limiting
> impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Airlines,* 527 U.S. 471, 489 (1999).

The *Rosen v. CSC Credit Services* 1995 WL 318507 (N.D. Tex. Feb. 7, 1995)

(unpublished) case, although in another district and unpublished, provides a useful observation

for the Court.  The *Rosen* Court addressed a situation where the employer was aware that the

plaintiff has a potentially cancerous goiter, and explained the "regarded as" definition in this

context as follows:

> Plaintiff argues that because [defendant] knew that she had a multinodal goiter, and knew
> that she believed that it was potentially cancerous, she was 'regarded as having such an
> impairment.'  An examination of the case law, however, shows that protection under this
> category typically applies when an employer regards an employee as unqualified for a
> particular  position because of an actual mental or physical condition that may not, in
> fact, limit the employee's ability to work.

(*Id.* at *2).  The Court finds that the *Rosen* Court correctly observed that the "regarded as"

category typically applies where an employer regards an employee as unfit for a particular

position because of an actual condition that does not, in reality, limit the employee's ability to

work.  The Court finds that although Defendant may have believed Plaintiff's lump was

potentially cancerous (i.e. a disability), this fact scenario is not encompassed under the "regarded as" disabled definition.

Because the ADA does not provide definitions of its categories of disabilities, the regulations addressing these definitions are particularly useful. The 29 C.F.R. 1630.2(l), ADA Interpretative Guide, sets forth three different way in which an individual may satisfy the definition of "being regarded as having a disability:"

> (1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

> (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment;

> (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. 1630.2(l), ADA Interpretative Guide.

The example set forth in the ADA Interpretative Guide of the first part of the definition above is where an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the employee will suffer a heart attack, this would be regarding the employee as substantially disabled. The Court finds that there is no evidence of this situation instantly.

For the definition's second category noted above, the ADA Interpretative Guide sets forth this example - an individual has a prominent facial scar, and the employer discriminates against the employee because of negative actions of customers, this would be regarding the employee as disabled. Again, the Court finds there is no comparable evidence instantly with Plaintiff's claim.

Lastly, for the third category set forth above, the ADA Interpretative Guide provides an example of an unfounded rumor that an employee has HIV, and the employer discharged that employee on those grounds. This would be regarding that employee as having a disability. Similar to the first two categories, the Court finds that there are no analogous circumstances instantly.

The ADA Interpretative Guide also notes that the United States Supreme Court in *School Board of Nassau County v. Arline,* 480 U.S. 273 (1987) has provided that Congress included the "regarded as" definition in the ADA because "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." *Arline* at 284. The Court finds that Plaintiff's claim falls outside the definition of being regarded as having a disability. As the ADA Interpretative Guide concludes:

> [t]herefore, if an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 'regarded as' part of the definition of disability.

29 C.F.R. 1630.2(l), ADA Interpretative Guide. The Court finds that Plaintiff's claim does not meet the definition of "regarded as" disabled. Therefore, the Court grants Defendant's motion for summary judgment on Plaintiff's Regarded as Disabled ADA claim.

### c.    ADA/Record of Disability

The Court finds that Plaintiff had a record of disability at the time she was fired. 29 C.F.R. 1630.2(k) provides "a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." The Court finds that Plaintiff had a record of disability (her cancer) at the time she was fired. Although Plaintiff was not actually disabled under the ADA, the Court finds

23

that in 2001, when she took her FMLA leave, she was disabled under the ADA.  Importantly, 29

C.F.R. 1630.2(k), ADA Interpretative Guide provides that "this provision protects former cancer

patients from discrimination based upon their prior medical history."  The Court finds that

Plaintiff has a record of impairment that substantially limited a major life activity with her

cancer in 2001.  The evidence demonstrates that Plaintiff had both breasts removed as a response

to the advanced cancer, and she was off work for six weeks.  (Plaintiff's Response, Ex. J,

Plaintiff's Dep. at 120).  Plaintiff also testified that after her surgery, she had no abdominal

muscles, had to roll out of bed each morning, could not get out of a bathtub, and had difficulty

climbing stairs and walking long distances.  (Plaintiff's Dep. at 257).  The Court finds that the

evidence, viewed in a light most favorable to Plaintiff, demonstrates that she had a record of

disability.

        The Plaintiff must now demonstrate that she was discriminated against because of her

record of disability.  Similar to Plaintiff's FMLA Retaliation claim, Plaintiff's ADA

discrimination claims turn on whether Plaintiff can prove discrimination under the *McDonnell*

*Douglas v. Green,* 411 U.S. 792, 802 (1973) burden shifting analysis.  The same *McDonnell*

*Douglas* burden shifting analysis applies to ADA discrimination claims.  *Brickers v. Cleveland*

*Bd. of Ed.,* 145 F.3d 846 (6th Cir. 1998).  As noted above, in the context of Plaintiff's FMLA

claim, the Court finds that Plaintiff has set forth a prima facie case of discrimination and that

Defendant's proffered reasons for her termination were a pretext for discrimination.  As

explained above, the Court finds that Defendant's increased scrutiny and differing treatment of

Plaintiff upon her return to work after her disability support this finding.  Further, the timing of

Plaintiff's termination is also relevant to this analysis.  The Court finds a reasonable jury could

24

find that her record of disability in 2001 contributed to her termination in 2003, particularly because she informed Defendant of the potential of the same disability before she was fired. Therefore, as explained more fully *infra,* the Court finds that Plaintiff has set forth sufficient evidence of discrimination to survive Defendant's motion for summary judgment.

The Court also finds that Plaintiff has established the remaining elements for a discrimination claim under the ADA, which as noted above are as follows:  (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position with or without reasonable accommodations; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) her position remained open after her termination.  *Hammon* at 449.  The Court finds that Plaintiff has shown that she was disabled, qualified to perform the essential functions of the job, and that she suffered an adverse employment action when she was fired.  Further, there is no dispute that Defendant knew Plaintiff had cancer in 2001.  Regarding the fifth element, Plaintiff's job was open after she was fired because Jacqualine Chivinsky testified that she filled it temporarily and then permanently. (Chivinsky's Dep. at 14).  Accordingly, the Court denies Defendant's motion for summary judgment regarding Plaintiff's ADA Record of Disability claim.

### d.    ADA/Reasonable Accommodation Claim

Plaintiff contends that Defendant failed to reasonably accommodate her by firing her rather than granting her reasonable leave to accommodate a person with an actual disability.  As noted above, the Court finds that Plaintiff did not have an actual disability at the time she was terminated.  Therefore, the Court finds summary judgment appropriate on this claim.

**CONCLUSION:**

25

The Court grants Defendant's motion for summary judgment on Count III

(ADA/Regarded as Disabled), Count V (ADA/Failure to Accommodate), and Count VI

(ADA/Determinable Disability).  The Court denies Defendant's motion for summary judgment

on Plaintiff's remaining Counts.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 29, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
July 29, 2005.


s/Jonie Parker
Case Manager